SRJ I VENTURE, Plaintiff,

and

the Travelers Insurance Company, and Rodney J. Preisser, Plaintiffs–Intervenors–Appellees,

and

the State Engineer, Jeris Danielson, and the Division Engineer for Water Division No. 2, Steve White, Defendants–Appellees,

v.

SMITH CATTLE, INC., a Kansas corporation, and Reid Cattle Co., a Colorado corporation, Defendants–Appellants.

No. 90SA333.

Supreme Court of Colorado,
En Banc.

Nov. 12, 1991.
As Modified on Denial of Rehearing
Dec. 9, 1991.

Brownstein, Hyatt, Farber & Madden, P.C., Charles B. White, Wayne F. Forman, Denver, for Travelers Ins. Co.

Anderson, Johnson & Gianunzio, Gregory L. Johnson, Mark T. Pifher, William Kelly Dude, Colorado Springs, for Rodney J. Preisser.

Gale Norton, Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Lois G. Witte, Deputy Atty. Gen., Linda E. White, First Asst. Atty. Gen., Denver, for State Engineer and Div. Engineer.

Ben L. Wright, Jr., Denver, for Smith Cattle, Inc.

Robert D. Gower, Elizabeth, for Reid Cattle Co.

Chief Justice ROVIRA delivered the Opinion of the Court.

This appeal was initiated by Smith Cattle, Inc. (Smith) and Reid Cattle Co. (Reid), defendants below, to review a decision of the District Court, Water Division No. 2. The water court granted judgment for Travelers Insurance Company (Travelers), denying Smith and Reid's request for a curtailment of Travelers' decreed water rights in order to preserve the natural subirrigation, seepage and springs on Smith's property. The court also denied Smith and Reid's request to enjoin Travelers, a junior water rights holder, from pumping water from certain wells. The water court also determined that certain of Smith's water rights were abandoned or partially abandoned. We affirm.

I

We primarily rely on the trial court findings for distillation of the following facts. The dispute in this case centers around water rights located in Horse Creek Basin, an area of over 1,000 square miles located in parts of El Paso, Elbert, Lincoln, and Crowley Counties, Colorado. The Nussbaum Alluvium is the principal water source for the basin formed by Little Horse Creek and the Steels Fork Creek. The degree of irrigation in the basin varies widely—some areas receive full water supply while other areas are marginally irrigated and receive water only after flooding.

The Nussbaum Alluvium discharges water to the surface along a continuous line of seeps and springs. On the Smith Ranch, below this seep line, lies a "bog" area where a substantial amount of natural vegetation is supported by water discharged from the Nussbaum formation. Travelers' wells and those of Rodney J. Preisser lie in the southeastern part of the Nussbaum Alluvium and are the closest wells to the seeps and springs which provide the flow to Steels Fork Creek, the East Branch of Steels Fork, and Little Horse Creek. Preisser owns the absolute and conditional water rights decreed to wells numbered 5, 6, and 11 through 15. Travelers is the owner of the absolute and conditional water rights decreed to wells numbered 1 through 4 and 7 through 10. All of these wells withdraw groundwater from the Nussbaum Alluvium. Both Smith's and Reid's water rights, including surface and ground water rights, are senior to those decreed to Travelers' and Preisser's wells. Smith and Reid both divert water from Little Horse Creek and Steels Fork Creek downstream from the Nussbaum Alluvium.

From April until October, most of the water discharge from the Nussbaum is consumed by evapotranspiration [1] from naturally occurring vegetation. During this growing season, the water discharge is also diverted and consumed by Smith, greatly diminishing the surface flow leaving the ranch. After the growing season, beginning in November each year, Smith's reservoirs are filled to active storage capacity over a period of 45–70 days. Once Smith's reservoirs are filled, Steels Fork Creek flows southeast toward Reid's ranch,

1. Evapotranspiration is defined as "loss of water from the soil both by evaporation from the surface and by transpiration from the plants growing thereon." *Webster's Third New Int'l Dictionary* 787 (1986). "Transpiration is the process by which plants absorb moisture for growth and reproduction and release the excess through pores in leaves and stems." 1 G. Vranesh, *Colorado Water Law* 7 (1987).

where it is diverted by the Brooks Ditch, which is owned by Reid.

Little Horse Creek also receives discharge from the Nussbaum Alluvium. The flow of Little Horse Creek is subject to evapotranspiration losses during the seven-month growing season and to surface diversions from three ditches owned by Reid and from two reservoirs owned by parties not involved in this suit. Except when heavy rainstorms occur, water does not flow on the surface of either Steels Fork or Little Horse Creek downstream from Reid's Ranch.

Approximately 52 wells have been constructed in the Nussbaum Alluvium since 1948. In two previous cases, W–2545 and W–3890, the water court found, *inter alia,* that there was water available for appropriation by wells 1 through 15 in the amount set forth in the decrees, and the withdrawal of any ground water by those wells would not injuriously affect any vested water rights.

This action was commenced when the original plaintiff, SRJ I Venture (Venture), filed a complaint seeking a declaratory judgment that the Arkansas River Rules [2] were inapplicable to the wells located in the Nussbaum Alluvium because the Nussbaum was independent of the Arkansas River. Venture also sought a declaration that operation of their wells was not injurious to the senior water rights of Smith and Reid. The state and division engineers had been attempting to apply the Arkansas River Rules to Venture's wells, thus requiring well permit conditions and administration. Venture, therefore, also requested that the court enjoin the engineers from administering Venture's ground water rights as a

result of a call [3] that the engineers had placed on Little Horse Creek and Steels Fork Creek. Venture also sought to enjoin Smith and Reid from placing calls for their decreed senior water rights on those two streams.

Smith and Reid filed an answer and a counterclaim requesting an injunction against the pumping of certain Venture wells. The state and division engineers answered the original complaint and asserted that the Arkansas River Rules applied to Venture's wells.

Travelers, as owner of wells 1–4 and 7–10, moved to intervene as plaintiff, and the motion was granted. On May 29, 1987, the court entered a partial summary judgment in favor of Travelers and Venture, holding that the Arkansas River Rules do not apply to their wells. This ruling was certified as final in accordance with C.R.C.P. 54(b), was appealed to this court, and we affirmed in *State Engineer v. Smith Cattle, Inc.,* 780 P.2d 546 (Colo.1989).

After the May 1987 grant of partial summary judgment, Preisser, who held a first deed of trust on Venture's water rights, succeeded to the entire interest in the water rights after Venture defaulted on its obligation. Preisser moved to intervene as plaintiff and the motion was granted.

On September 12, 1988, Smith and Reid filed an amended answer and counterclaim in which they requested that both Preisser and Travelers be enjoined from pumping their wells because of the detrimental effect the pumping had on Smith's and Reid's ability to meet the needs of their senior water rights.

Pursuant to an agreement among the parties the state was ordered to prepare a

---

2. The Arkansas River Rules are formally titled "Rules and Regulations Governing The Use, Control and Protection of Surface and Ground Water Rights Located in the Arkansas River and its Tributaries" and were adopted and approved by the State Engineer in 1972. These rules affect underground water and regulate ground water diversions in the Arkansas River and its tributaries. In its June 25, 1990 order, the water court found that, if the Arkansas River Rules were applied to the wells in this basin, all wells for which water rights applications were filed before July 1, 1972, would be allowed to pump

only three days out of seven and those wells for which applications were filed after July 1, 1972, would be curtailed absent a decreed augmentation plan.

3. A call is placed on a river when a senior appropriator forces upstream juniors to let flow sufficient water to meet the requirements of the senior priority. *See* 2 G. Vranesh, *Colorado Water Law* 684 (1987); *Kuiper v. Well Owners Conservation Ass'n,* 176 Colo. 119, 129, 490 P.2d 268, 273 (1971).

proposed plan for administration of the subject water rights, as well as other water rights that could be affected under a plan for administration in the Horse Creek Basin. The state engineer filed such a plan in February 1989. The first phase of the proposed plan was to conduct investigations and issue orders to correct newly discovered illegal and improper uses of water in the Horse Creek Basin. Phase II of the plan was to curtail pumping by well owners to maximize beneficial use of both underground water tributary to the surface streams and surface water rights in the basin. Phase III involved monitoring water use and water levels in the basin to determine if the desired effect was being achieved.

On November 3, 1989, the court granted Travelers' motion for partial summary judgment against that portion of Smith and Reid's counterclaim which requested that Travelers and Preisser be enjoined from pumping their wells so that the undecreed natural subirrigation, seepage, and springs on the Smith property would be protected. Smith and Reid appeal this order.

On January 23, 1990, Travelers amended its complaint by adding a new claim for relief. It alleged that certain water rights decreed to Smith had been abandoned and it sought to enjoin Smith from exercising a call for the benefit of those abandoned rights. Smith and Reid answered and Smith renewed its counterclaim that Travelers' well pumping was irreparably injuring its senior decreed water rights.[4]

Stipulations were executed between Preisser, Reid and Smith and between Preisser and the state and division engineers. Since the engineers' study concluded that the data was insufficient to establish that Smith and Reid's water rights were injured as a result of well pumping in the Nussbaum Alluvium, Preisser stipulated that he would dismiss his claims against the engineers for declaratory or injunctive relief on that issue. Preisser stipulated that he would limit the pumping of his wells and dismiss his claims for declaratory or injunctive relief against Smith and Reid. Smith and Reid stipulated that they would not seek an injunction against the pumping of Preisser's wells.

In May 1990, as a result of these stipulations, the court ordered dismissal of Preisser's claims against the engineers and Smith and Reid, and dismissal of the counterclaims of Smith and Reid against Preisser.

Trial then commenced with Travelers, the state and division engineers, and Smith and Reid participating. Smith and Reid presented evidence that, since the construction of Travelers' wells, the springs at the seep line of the Nussbaum Alluvium had diminished, causing a reduction in surface flow in Steels Fork, resulting in decreased flow of available water for their use as holders of senior water rights.

The state engineers introduced evidence that Smith failed to use many of its water rights for 33–52 years and allowed many of its diversion and storage structures to fall into disrepair. The engineers recognized that Reid Ranch, located downstream from Smith Ranch and 15 miles from Travelers' wells, suffered declines in water availability. They asserted, however, that the decline was due to excessive illegal and undecreed water uses by parties not involved in this suit and that these uses overshadow the impact, if any, of depletions attributable to Travelers' well-pumping.

In June 1990, the court entered its findings and orders. The water court implemented Phase I of the engineers' plan and ordered that illegal and undecreed water usage by uninvolved parties be first curtailed to protect senior appropriators before beginning administration of decreed water rights. The court thus declined to enjoin pumping of Travelers' wells. The court also found that Smith had abandoned some of its water rights because certain of its ditch and reservoir structures were either not used for an unreasonable period or there was a failure to maintain their capaci-

4. Smith and Reid joined together in all pleadings in this action although the rights asserted were often only those of Smith.

ty, evidencing an intent to abandon the accompanying water rights.

Smith and Reid also appeal this order.

## II

Smith and Reid first assert that in its November 3, 1989 order, the trial court erred by dismissing that portion of their counterclaim which requested that the pumping of Travelers' wells be curtailed. This order, Smith argues, failed to protect its undecreed water rights in its seeps, springs, and natural subirrigation.

Spring and seep discharge naturally irrigates and subirrigates Smith's hay-producing lands. The source of the springs and seeps is the Nussbaum Alluvium from which Travelers' wells pump water. In entering judgment for Travelers, the trial court found that Smith failed to support its contention that the seeps and springs were nontributary to Steels Fork Creek. As a matter of law, the court found "Smith's undecreed rights to the seeps and springs on its property for subirrigation of vegetation are inferior and cannot be relied upon to curtail Travelers' decreed rights."

■ Smith asserts that section 37–82–102, 15 C.R.S. (1990), protects its undecreed rights in the seeps and springs arising on its lands from upstream depletion by the operation of Travelers' wells. Section 37–82–102 outlines the priority of right to spring water:

All ditches constructed for the purpose of utilizing the waste, seepage, or spring waters of the state shall be governed by the same laws relating to priority of right as those ditches constructed for the purpose of utilizing the water of running streams; but the person upon whose land the seepage or spring waters first arise shall have the prior right to such waters if capable of being used upon his lands.

We have held that section 37–82–102 is applicable only to nontributary springs, *Ranson v. City of Boulder*, 161 Colo. 478, 479, 424 P.2d 122, 123 (1967); *Cline v. Whitten*, 150 Colo. 179, 185, 372 P.2d 145, 148 (1962); *Nevius v. Smith*, 86 Colo. 178,

279 P. 44 (1929); and, therefore, unavailable to protect tributary springs and seeps.

■ Smith admits that the seeps, springs and natural subirrigation on the Smith Ranch are tributary to Steels Fork Creek but asserts that those springs and seeps are nevertheless entitled to protection because they do not become tributary until they have reached the flow of Steels Fork Creek. Smith relies on our holding in *Lomas v. Webster*, 109 Colo. 107, 122 P.2d 248 (1942), where, after quoting the language of section 37–82–102, we stated:

We have uniformly held that *as to such waters, which are not tributary to a natural stream*, the foregoing proviso means exactly what its words import. It is only when such *seepage water would ultimately reach and become part of a natural stream* that an appropriator thereof can acquire a right to the use of such superior to that of the owner of the land.

109 Colo. at 110, 122 P.2d at 250 (citations omitted). In this case, however, the water court correctly determined that the spring and seep waters on the Smith Ranch are tributary because they flow unencumbered into Steels Fork Creek except for the effect of evapotranspiration.

The court, in arriving at this conclusion, considered the testimony of Robert Brogden, a hydrology and water rights expert hired by Smith to conduct investigations of the surface and groundwater conditions in the vicinity of Smith Ranch. Brogden testified that no geologic formations existed to impede the path of the water discharged from the springs from reaching Steels Fork Creek, and that the only factor impeding the water flow was consumption by plants on the Smith Ranch.

In *Giffen v. State of Colorado*, 690 P.2d 1244, 1247 (Colo.1984), we rejected the concept that water is inherently nontributary if it is evaporated from soil or surface or transpired by plant life and consequently fails to actually reach the stream. Thus, "water lost by evapotranspiration is an integral part of a single hydrologically connected system and must be regarded as tributary to the aquifer and, subsequently,

to the stream." *Id.* Since the evidence supports a finding that evapotranspiration is the only factor impeding the flow of water from the Smith Ranch to Steels Fork Creek, we find that the water court was correct in holding that the springs and seeps on the Smith Ranch are tributary and those water rights are not, therefore, protected under section 37–82–102.

■ Alternatively, Smith asserts that, since the decrees that it obtained in 1960 for water ditches listed the springs and seeps as sources of the water, the undecreed spring and seep rights are protected under section 37–92–102(2)(a), 15 C.R.S. (1990): "Water rights and uses vested prior to June 7, 1969, in any person by virtue of previous or existing laws, including an appropriation from a well, shall be protected subject to the provisions of this article." We need not, however, reach the merits of this assertion since it was not adequately raised in the trial court. *Matthews v. Tri–County Water Conservancy Dist.,* 200 Colo. 202, 206, 613 P.2d 889, 892 (1980).

Since Travelers' well water rights are decreed, they are superior to undecreed diversions of water, just as they are superior to junior priority rights. *See* § 37–92–306, 15 C.R.S. (1990). Smith's spring, seep, and subirrigation rights are undecreed, and the trial court was, therefore, correct in refusing to curtail Travelers from exercising their right to pump water from their wells.

### III

■ Next, we conclude that the water court properly refused to enjoin Travelers from pumping its wells after determining that such pumping was not materially injurious to Smith and Reid's senior water rights. Section 37–92–502(2)(a), 15 C.R.S. (1990), requires the division engineer to make a determination that a junior "diversion is causing or will cause material injury to such water rights having senior priorities" before requiring discontinuance of the junior diversion. "The materiality of injury depends on all factors which will determine in each case the amount of water such discontinuance will make available to

such senior priorities at the time and place of their need." We have held that:

> [W]henever a court ... can make a finding that the pumping of a junior well materially injures senior appropriators who are calling generally for more water, there exists a legitimate and constitutional ground and reason for the regulation of the well....

*Fellhauer v. People,* 167 Colo. 320, 329, 447 P.2d 986, 991 (1968).

The water court found that cessation of the "illegal and improper uses of water," identified in the state's plan for administration, would result in an increase in water available to Smith and Reid. The illegal and undecreed uses noted in the state's administrative plan were unrefuted. Furthermore, the court found that curtailment of Travelers' wells alone, without curtailment of other wells diverting from the Nussbaum Alluvium, would not increase water availability to Smith or Reid and that prohibiting the pumping of Travelers' wells would result in significant economic harm to Travelers without producing a corresponding economic benefit to Smith and Reid. Therefore, by determining that the operation of Travelers' wells was not materially injuring the water rights of Smith or Reid, the court properly applied the relevant materiality of injury test and correctly declined to enjoin the pumping of Travelers' wells.

### IV

■ Finally, we consider whether the trial court erred in ruling that certain of Smith's water rights were totally or partially abandoned. Smith asserts that the order was not supported by the evidence.

In *People v. City of Thornton,* 775 P.2d 11, 19 (Colo.1989), we held that "[b]ecause abandonment is a question of fact depending on the particular circumstances of each case, the water court's resolution of the factual issues presented will not be disturbed upon appeal unless the evidence is wholly insufficient to support the decision."

The water court found that consumptive water use on the Smith Ranch had not

diminished over time, but that Travelers had established that there were significant periods of nonuse of the Smith water rights in certain ditches and reservoirs.[5] The periods of nonuse ranged from 33 to 52 years.

The water court found that, despite the availability of water for diversion by these structures, they were not used and were allowed to fall into disrepair. Since the periods of nonuse were unreasonable, they evidenced an intent by Smith to abandon those rights.

Abandonment is "the termination of a water right in whole or in part as a result of the intent of the owner thereof to discontinue permanently the use of all or part of the water available thereunder." § 37–92–103(2), 15 C.R.S. (1990). A rebuttable presumption of intent to abandon arises where there is continuous and unexplained nonuse of a water right for an unreasonable period of time. *Denver v. Snake River Water Dist.*, 788 P.2d 772, 776 (Colo. 1990). This presumption shifts the burden to the water right owner to introduce enough evidence to rebut the presumption by establishing some fact or condition excusing such long misuse. *Id.*

Smith contends that the reason for nonuse was unavailability of a divertable water supply and that this fact was proved at trial. The water court, however, relying on the engineers' report, found that, despite a dwindling water supply, water was available for diversion by these structures during the periods of nonuse. Consequently, Smith failed to rebut the presumption of abandonment.

Since the court applied the proper test and sufficient evidence exists in the record to support a finding of abandonment, we affirm the trial court's ruling.

Accordingly, the orders dismissing Smith and Reid's counterclaim for curtailment of pumping in order to protect Smith's undecreed subirrigation, seepage, and spring rights, determining certain of Smith's water rights abandoned, and refusing to enjoin Travelers from pumping its wells are affirmed.

---

**5.** Thurlow Land & Livestock Company's East Ditch, Thurlow Land & Livestock Company's Reservoirs "F," "N," "P," Denning Ditch Nos. 1 and 2, Brett Gray Ditch No. 2, Collins No. 1 Reservoir Ditch, Collins No. 1 Reservoir, Gordon Reservoir, and Brett Gray Reservoir.